Lauren I. Scholnick (Bar No. 7776)
Jonathan Thorne (Bar No. 12694)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
675 E. 2100 South, Suite 350
Salt Lake City, UT 84106
Phone: (801) 359-4169
Email: lauren@utahjobjustice.com
         jonathan@utahjobjustice.com

Lena F. Masri (DC 100019)
Gadeir I. Abbas (VA 81161)
Justin Sadowsky (DC )
Zanah Ghalawanji (MI )
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave SE
Washington, DC 20003
Phone: (202) 642-7420
Email: ldf@cair.com

*Attorneys for Plaintiff*

*Pro hac pending*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALLAN GOODSON; | COMPLAINT AND JURY DEMAND |
| Plaintiff, | |
| v. | Case No. |
| | Judge: |
| BRADSHAW CHEVROLET COMPANY, a Utah domestic profit corporation; | |
| Defendant. | |

Plaintiff **ALLAN GOODSON ("Goodson" or "Plaintiff"),** by and through his attorneys, CAIR National Legal Defense Fund and Strindberg Scholnick Birch Hallam Harstad Thorne, brings this action against **BRADSHAW CHEVROLET COMPANY ("Bradshaw" or "Defendant"),** for compensatory and punitive damages, declaratory and injunctive relief, pre-judgement and post-judgement interest, costs and attorneys' fees for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*. committed when Bradshaw (a) refused to provide him with reasonable religious accommodations to take short prayer breaks during work and attend *jum'uah* prayer services, even though an accommodation did not and would not have imposed an undue hardship on business operations; (b) subjected him to harassment and a hostile work environment on the basis of his religion; and (c) retaliated against him for filing a complaint of discrimination by terminating his employment.

### Jurisdiction and Venue

1.      Goodson's claims for discrimination on the basis of religion and retaliation in violation of Title VII are brought under 42 U.S.C. §2000e-5.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331, 1343.

3.      This Court has personal jurisdiction over Bradshaw because Bradshaw resides and conducts business in this judicial district.

4.      Goodson's claims for attorneys' fees and costs are predicated upon Title VII, 42 U.S.C. §2000e-5(k), Utah Code §34A-5-101 and Fed. R. Civ. P. 54.

5.      Venue is proper under 28 U.S.C. § 1391 because Bradshaw operates within the geographical boundaries of this district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.

## Parties

6.      Plaintiff Allan Goodson is a Muslim and was at all relevant times an "employee" of Defendant Bradshaw, as the term is defined by Title VII.  Plaintiff Goodson resides in Iron County, Utah.

7.      Defendant Bradshaw is a domestic profit corporation incorporated under the laws of Utah (Business Entity No. 564793-0142). Defendant Bradshaw's headquarters and principal place of business is located at 360 N Main Street, Cedar City, Utah 84721. Defendant Bradshaw regularly and systematically conducts business in the State of Utah and within Iron County, Utah. Defendant Bradshaw was at all relevant times an "employer" as the term is defined by Title VII.

## Administrative History

8.      Goodson timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on August 17, 2020.

9.      Goodson received a Notice of Right to Sue on May 18, 2021.

10.     Goodson filed this complaint within 90 days from the date Plaintiff received the Notice of Right to Sue from the EEOC.

11.     Goodson has exhausted his administrative remedies.

**Factual Background**

12.     Goodson is a Muslim. He has a sincerely held religious belief that he must pray five times a day during prescribed prayer times. These prayers occur (1) after dawn – *fajr,* (2) early afternoon– *dhuhr,* (3) late afternoon – *asr,* (4) after sunset – *maghrib,* and (5) late evening – *isha.* Each prayer takes approximately five to ten minutes to complete.

13.     Goodson also has a sincerely held religious belief that he must attend *jum'uah*, or Friday congregational prayers at his mosque. The service lasts approximately one hour.

14.     Defendant Bradshaw employed Goodson on August 9, 2019 as an Automotive Lube Technician. At the time Bradshaw hired him, Goodson was Christian.

15.     Goodson was an exemplary employee. He was frequently complimented by his supervisors and co-workers on his work ethic and positive attitude.

16.     In addition, Bradshaw saw so much potential in Goodson that they invested in trainings to help elevate his skill set and eventually promote him. Goodson successfully completed the following courses at the General Motors Service Technical College:

- Introduction to Hybrid & Electric Vehicles (18400.30W-R2)

- Dealer Case Management: Technical Assistance Center (TAC) Case Handling (VMVDC.M17W2)

- Electrical/Electronics Stage 2 (18043.22W)

- Electrical/Electronics Stage 3 (18043.23W)

- Electrical/Electronics Stage 4 (18043.24W)

- Handling Field Actions for Service Technicians (VMVFA.019W5)

- Techline Connect Overview and Installation (10040.15V)

- General Motors Dealer Safety Overview (SCFGM.020W1)

- Understanding the Importance of Cyber Security (FRPCS.020W1)

- Dealership Anti Harassment: Treating People Right (F1PAH.020W1)

- Field Action Safety and Non-Compliance Recall Best Practices (VRPFA.020W!)

- Electrical/Electronics – Stage 3 – MX (18043.23W)

- Electrical/Electronics – Stage 4 – MX (18043.24W)

- Electrical/Electronics – Stage 5 – MX (18043.25W)

- Electrical Electronics Stage 6 – MX (18043.26W)

- Maintenance – Underhood (00510.05W)

- Maintenance - Behind the Wheel (00510.10W)

- Maintenance - Under Car (00510.15W)

- Electrical/Electronics Stage 3 (18043.03W-R3)

- Electrical/Electronics Stage 2 (18043.02W-R4)

- Multiple Diagnostic Interface (MDI) Familiarization (16048.25W-R4)

- Global Diagnostic System (GDS) 2/ MDI (16048.30W-R2)

- Service Information (SI) Overview (10041.12W-R2)

- Multiple Diagnostic Interface 2 (MDI 2) (16048.31W)

- Tech2Win Diagnostic Tool (16048.40W)

- Global Diagnostic System (GDS) 2 (16048.30W-R3)

- Preventing Unintended Airbag Deployment (22048.55V)

- Service Programming System Update (10216.14V)

- Data Bus Diagnostic Tool (16048.36W-R2)

- High Voltage System Safety (18400.00W)

- Documenting the Three Cs of a Job Card (VMVCC.C18W)

- Electrical/Electronics Stage 5 (18043.25W)

- GM Global Electric Systems 1 (18044.20W1)

- GM Global Electric Systems 2 (18044.20W2)

- Proper Handling of Field Actions with Programming Events (10217.13V)

- Multiple Diagnostic Interface (MDI) Familiarization (16048.25W-R2)

- Personal Shop Safety (09510.01W)

- Multiple Diagnostic Interface (MDI) Familiarization (16048.25W-R3)

- Lubrication Inspection and Maintenance (10010.00W)

- Cooling System Inspection and Maintenance (11010.00W)

- Automatic Transmission Inspection and Maintenance (17010.00W)

- Electrical/Electronics Stage 3 (18043.03W-R4)

- Tech2Win (16048.40W)

- Proper Handling of Field Actions with Programming Events (10217.13V)

- Service Information (SI) Overview (10041.14W)

17.     Goodson is currently pursuing his bachelor's degree in general studies at Southern Utah University.

18.     Goodson converted to Islam in October 2019.

19.     His wife, Georgia Goodson, also an employee of Bradshaw working as a Warranty Clerk, gifted him a ring inscribed with the Arabic *shahada*. The *shahada* is the Muslim proclamation of faith and a primary tenant of the religion. Goodson wore the ring to work frequently and employees asked him about it.

20.     On March 6, 2020, Goodson asked his manager, T.C. Caddell, to take brief prayer breaks at work.

21.     This request posed no undue hardship because only two of the prayers fall within Goodson's shift, the prayers take 5-10 minutes to complete and are equivalent to a short restroom or smoke break, and one of the prayer breaks fell during Goodson's lunch break.

22.     Goodson also requested a religious accommodation to attend *jum'uah* prayer services on Fridays. Goodson proposed to work half days on Friday or have the whole day off. Goodson offered to shift his hours and work extended days on Monday through Thursday to make up for the time at *jum'uah* on Friday.

23.     In response, Caddell asked Goodson about his religious beliefs. Goodson explained that he was a Muslim. Caddell gawked at Goodson and asked

whether he "bows down" and does that "crazy stuff."

24.    Caddell refused Goodson's request to take brief prayer breaks because, as he explained, it would be a bad idea if he tried to pray at work due to the prejudices of the other employees.

25.    Caddell declined Goodson's request even though Bradshaw employees, including Goodson, regularly took brief breaks for non-religious reasons without issue.

26.    Further, employees who were members of the Church of Jesus Christ of Latter-day Saints took breaks without issue. For example, Service Director Richard Batt, one of Goodson's supervisors, had LDS visitors come to his office to speak with him. Moreover, Georgia Goodson regularly left her shared office space with Batt to provide him privacy to pray.

27.    Caddell also declined Goodson's request to attend *jum'uah* on Fridays and claimed he would have to pay Goodson overtime if he approved the request. Caddell further claimed that he needed Goodson to perform oil changes on Friday, despite the fact that Bradshaw offered oil changes on other days, and despite the fact that Goodson requested to work half days on Friday.

28.    Caddell denied Goodson's request to take time off on Fridays for *jum'uah* prayers despite the fact that Bradshaw accommodated employees Tim Wilson and George Loosley by allowing them to work longer shifts on certain days in exchange for half days or the entire day off on Friday.

29.     Upon information and belief, Bradshaw and its management were not aware of Goodson's Islamic faith prior to his requests for religious accommodations.

30.     Bradshaw forced Goodson to violate the tenets of his faith because it prohibited him from taking brief prayer breaks at work and attending *jum'uah*.

31.     Following the denial of Goodson's requests, Caddell asked Georgia Goodson if she was also a Muslim. Georgia Goodson responded that she was not a Muslim.

32.     Bradshaw employees and management alike subjected Goodson to a hostile work environment because of his Islamic faith.

33.     Batt regularly mocked Goodson's faith.  Batt asked Goodson, "where's your magic carpet?" and referred to him as a "terrorist."

34.     On one occasion, Batt told Goodson that he "betrayed [his] race (white) because Islam is a non-white religion."

35.     Batt told Goodson that a young Arab man used to work at the dealership and that he had harassed the Arab employee in the same manner until the man eventually quit.

36.     Batt also told Goodson that he was wrong for not being a Mormon and that Goodson would be cast into outer darkness.

37.     Shop Foreman Dallin Robinson repeatedly mocked Goodson and asked whether he was going to "read the holy scripture this weekend" and said, "the Qur'an does not count as holy scriptures." Robinson made this comment on at least two

occasions, including on or around March 27, 2019 and April 3.

38.     Further, Robinson asked Goodson whether he "blew up any buildings over the weekend." He repeated this question for the next two months, including on or around March 16, 2019, March 23, April 6, April 13, and April 27.

39.     Robinson also made threats to behead and shoot Muslims.

40.     On March 3, 2020, Goodson's Muslim and Middle Eastern friend came to visit him at work, but Goodson was not there. When Goodson returned to work, Batt chastised him saying, "hey a couple of sand n-----s came to see you." He continued to mock Goodson's friend by claiming, "the darker your skin color, the more evil you are."

41.     On another occasion, the *athan* (Islamic call for prayer) began to ring on Goodson's phone. Employees Jerry Doyan and Robinson overheard and proclaimed that Goodson, "needs to change his name to Mohammad," "marry a five-year old girl," and "start blowing up innocent people."

42.     Around March 6, 2020, Goodson reported the ongoing religious harassment by Batt and Goodson's coworkers to Caddell.

43.     However, Caddell refused to take action and dismissed the employees' behavior as "just joking around."

44.     Bradshaw was aware that Goodson faced ongoing harassment, as it occurred in public and was often carried out by management. Despite Goodson's pleas that management and other employees stop harassing him, they did not stop,

and management refused to do anything about it.

45.     After Goodson's complaint to Caddell, around March 2020, Bradshaw decreased Goodson's hours despite the fact that Bradshaw alleged it needed Goodson to work Fridays. Bradshaw simultaneously emailed employees that it received a small business loan, so it did not need to decrease employee hours during the Covid-19 pandemic. Nonetheless, Bradshaw decreased Goodson's hours from 35–40 hours per week to 0 hours per week. Bradshaw did not decrease the hours of any other employees.

46.     On April 2, 2020, Goodson complained to Caddell via e-mail about the lack of hours. Caddell walked into Georgia Goodson's office and indicated that he had decreased Goodson's hours because of his faith and his religious accommodation requests. Caddell made a statement to the effect of, "well Allan wanted time off for his prayer anyway."

47.     Goodson returned to work shortly after his e-mail complaint, but his hostile work environment continued.

48.     In April 2020, Goodson again reported the ongoing religious harassment by Batt and Goodson's coworkers to Caddell.

49.     Caddell told Goodson there was no process for filing complaints.

50.     In May 2020, Goodson made a report of discrimination to General Motors. General Motors responded that it could not assist Goodson because Bradshaw was a privately-owned dealership.

51.     Because management ignored the harassment that Goodson reported or members of management observed, and, at times, participated in it, Bradshaw sent a clear message that it condoned and encouraged religious harassment of Goodson.

52.     On May 26, 2020, Goodson complained to Batt that Bradshaw had been deducting money from his paycheck regarding a dry-cleaning service Goodson did not subscribe to. On May 27, 2020, Goodson again approached Batt about the matter. He yanked his own wallet out and yelled, "what do you want me to do Allan, pull the money out of my wallet?! Are you that desperate?!" When Goodson asked why Batt was berating him, he responded, "my problem with you is that you're a sand n----- terrorist."

53.     Goodson then told Batt that he intended to file an employment discrimination complaint with a government agency. Batt threatened to terminate Goodson if he turned him into a government agency, stating in effect, "you turn me in and you've had it buddy."

54.     During his lunch break on May 28, 2020, Goodson electronically filled out the Equal Employment Opportunity Commission's intake questionnaire.

55.     While Goodson filled out the intake questionnaire, Caddell came up behind him and asked him what he was doing. Goodson explained that he was filing an employment discrimination complaint against Bradshaw. Caddell asked Goodson to provide the completed intake questionnaire to him. Caddell then went outside to the back of the building and made a phone call.

56.     Following notice that Goodson filed an employment discrimination complaint, Bradshaw retaliated against Goodson by terminating him, not once, but twice, and for different reasons.

57.     On June 1, 2020, Batt called Goodson into his office and reprimanded him for a service he provided to a customer. Goodson had performed a tire rotation service on a customer's car, marked that he had done so on the service paperwork, and told the customer that rotating tires too often can cause premature wear.

58.     Batt claimed Goodson's markings were unclear and was angry about what Goodson told the customer.

59.     Goodson had performed the service in accordance with the trainings Bradshaw had provided him. Further, Goodson had previously documented similar advice without incident or any disciplinary notice.

60.     Batt then immediately terminated Goodson and chastised him, "go file a report about that!"

61.     Immediately following the termination, Goodson walked over to Mark Bradshaw's office, along with Georgia Goodson, and explained that Batt harassed him because of his religion and that he believed he had terminated him because he was Muslim. Mark Bradshaw told Goodson to go home.

62.     Later that day, Mark Bradshaw called Goodson and asked him to return to the office to discuss his termination.

63.     When Goodson returned to work the next day, he met with Batt and

Mark Bradshaw in Mark Bradshaw's office. Mark Bradshaw confirmed the termination of Goodson's employment. He explained that Goodson was being terminated because he had disrespected a supervisor.

64.    Bradshaw's given reasons for Goodson's termination were not the true ones. Instead, Bradshaw fired Goodson based on Goodson's religion. Bradshaw had offered two different reasons for Goodson's termination each time it terminated him. During the first instance, Batt terminated Goodson because his markings on his service paperwork were unclear. During the second instance, Mark Bradshaw terminated Goodson because he had disrespected a supervisor.

65.    When Goodson was terminated the second time, Batt, who was in the room, mocked Goodson by waving his middle finger at him and winking at him.

## CLAIMS FOR RELIEF

### Count I
### Discrimination on the Basis of Religion - Failure to Accommodate in Violation of Title VII

66.    Plaintiff realleges and incorporates the allegations throughout the Complaint.

67.    Defendant knew of Plaintiff's need for a reasonable accommodation for religious beliefs. Defendant failed and refused to provide Plaintiff with a reasonable accommodation for his religious beliefs even though a reasonable accommodation was requested, was available, and could have been made without any undue hardship. Instead, Defendant terminated him.

68.     Defendant unlawfully forced Plaintiff to violate the tenants of his faith by prohibiting him from performing his prayers in accordance with his sincerely held religious beliefs.

69.     Defendant does not have a legitimate business purpose for denying Plaintiff's religious accommodation requests.

70.     Defendant's actions in refusing to provide Plaintiff with a reasonable accommodation for his sincerely held religious beliefs constitute discrimination on the basis of religion in violation of Title VII.

71.     As a result of Defendant's unlawful actions, Plaintiff has suffered a loss of earnings, wages, seniority, and benefits, a loss of earning capacity, a loss of future earnings, a loss of enjoyment of life, embarrassment, humiliation, emotional distress and related damages.

**72.**     Defendant acted with malice and reckless indifference to plaintiff's federally protected rights.

<u>**Count II**</u>
**Discrimination on the Basis of Religion – Disparate Treatment**
**in Violation of Title VII**

73.     Plaintiff realleges and incorporates the allegations throughout the Complaint.

74.     Defendant discriminated against Plaintiff by denying his religious accommodations while approving similar, non-religious breaks for non-Muslim employees, by denying his religious accommodations while approving, similar, religious

breaks for employees of the LDS faith, and by terminating him because of his religion.

75.     Defendant knew of, failed, and refused to provide Plaintiff with a reasonable religious accommodation while approving equivalent-in-time breaks for non-religious reasons.

76.     Defendant knew of, failed, and refused to provide Plaintiff with a reasonable religious accommodation while approving equivalent-in-time breaks for members of the LDS faith.

77.     Defendant discriminated against Plaintiff by treating religious breaks for employees of the LDS faith differently than religious breaks for Muslims.

78.     Defendant acted in conscious disregard of or reckless indifference to Plaintiff's right to be free from religious discrimination, knowing full well that Title VII required, unless excused by undue hardship, reasonable accommodation of their employee's sincerely-held religious beliefs and practices, by forcing Plaintiff to choose between his religion and his job by denying him a reasonable accommodation.

79.     Defendant does not have a legitimate business purpose for denying Plaintiff's religious accommodation requests, while approving accommodations for LDS members and approving non-religious breaks.

80.     Defendant terminated Plaintiff's employment because of his faith, despite the fact that Plaintiff was qualified for the job.

81.     Defendant's actions in refusing to provide Plaintiff with a reasonable accommodation for his sincerely held religious beliefs while approving non-

religious breaks, along with breaks for LDS members, constitute discrimination on the basis of religion in violation of Title VII.

82.     As a result of Defendant's unlawful actions, Plaintiff has suffered a loss of earnings, wages, seniority, and benefits, a loss of earning capacity, a loss of future earnings, a loss of enjoyment of life, embarrassment, humiliation, emotional distress and related damages.

83.     Defendant acted with malice and reckless indifference to plaintiff's federally protected rights.

### Count III
### Discrimination on the Basis of Religion – Hostile Work Environment in Violation of Title VII

84.     Plaintiff realleges and incorporates the allegations throughout this Complaint.

85.     Defendant discriminated against Plaintiff by subjecting him to to an ongoing, severe and/or pervasive discriminatory and hostile work environment.

86.     When Plaintiff was Christian, he did not experience discrimination or harassment. Only when Defendant become aware that Plaintiff converted to Islam when he submitted religious accommodation requests did he experience discrimination and harassment.

87.     Defendant and its employees did not subject non-Muslim employees to harassment on the basis of their religion.

88.     The conduct of Defendant and its employees was subjectively and objectively offensive.

89.     Defendant was aware of such conduct because Plaintiff complained to Defendant about the hostile work environment and because Defendant's management contributed to it.

90.     Defendant did not reasonably try to prevent or promptly correct the harassing behavior.

91.     Defendant's willful, intentional, and unlawful actions violate Title VII.

92.     Defendant acted with malice and reckless indifference to Plaintiff's federally protected rights in violation of Title VII.

93.     As a result of Defendant's unlawful actions, Plaintiff has suffered a loss of earnings, wages, seniority, and benefits, a loss of earning capacity, a loss of future earnings, a loss of enjoyment of life, embarrassment, humiliation, emotional distress and related damages.

## Count IV
### Retaliation
### in Violation of Title VII

94.     Plaintiff realleges and incorporates the allegations throughout this Complaint.

95.     Plaintiff engaged in protected activity when he requested reasonable religious accommodations to perform his prayers in accordance with his sincerely held religious beliefs, when he verbally complained to Defendant about discrimination and

the hostile work environment he was being subjected to, and when he filed an employment discrimination complaint against Defendant with the EEOC.

96.     Defendant unlawfully retaliated against Plaintiff by reducing his hours from 35-40 hours per week to 0 hours per week.

97.     Defendant further retaliated against Plaintiff by terminating his employment because he requested reasonable religious accommodation to perform his prayers in accordance with his sincerely held religious beliefs.

98.     Defendant retaliated against Plaintiff by terminating his employment because he verbally complained to Defendant about discrimination and the hostile work environment he was being subjected to, and because he filed an employment discrimination complaint with the EEOC, in violation of Title VII and the Utah Antidiscrimination Act.

99.     A causal connection existed between Plaintiff's protected activity and the materially adverse action.

100.    But for Plaintiff's requests for religious accommodation, and but for his complaints to his supervisor and to the EEOC, which Defendant was aware of, Defendant would not have reduced Plaintiff's hours and terminated his employment.

101.    Defendant does not have a legitimate, non-discriminatory reason for decreasing Defendant's hours or for terminating his employment.

102.    As a result of Defendant's unlawful actions, Plaintiff has suffered a loss

of earnings, wages, seniority, and benefits, a loss of earning capacity, a loss of future earnings, a loss of enjoyment of life, embarrassment, humiliation, emotional distress and related damages.

103.    Defendant acted with malice and reckless indifference to plaintiff's federally protected rights.

## Prayer for Relief

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement in his favor and against Defendant, on each and every county in this Complaint, and enter an Order awarding the following relief:

1.  An injunction:

    A.    prohibiting Defendant from discriminating against its employees on the basis of religion;

    B.    ordering Defendant to institute a religious accommodation policy allowing Muslim workers to take brief prayer breaks;

    C.    ordering Defendant to institute a religious accommodation policy allowing Muslim workers to attend *jum'uah*;

    D.    ordering Defendant to provide annual religious sensitivity trainings for its management;

2.  Payment for all economic damages, including but not limited to, back pay and benefits, front pay and benefits (in lieu of reinstatement);

3.  Payment for non-economic damages, including emotional harm;

4.  Punitive damages;

5.  Statutory damages;

6.  An award of attorneys' fees, costs and expenses of all litigation; and,

7.  Any further relief to which Plaintiff is entitled or that this Honorable Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED this 27th day of July, 2021.

Respectfully submitted,

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

**/s/** <u>Lauren I. Scholnick</u>
Lauren I. Scholnick

**CAIR LEGAL DEFENSE FUND**

/s/ <u>Lena Masri</u>
Lena F. Masri (DC 100019)
Gadeir I. Abbas (VA 81161)
Justin Sadowsky (DC )
Zanah Ghalawanji (MI )

*Attorneys for Plaintiff*